(No. 18174.—

THE GEORGE A. FULLER COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MIKE LEDINA, Defendant in Error.)

*Opinion filed June 23, 1928—Rehearing denied October 6, 1928.*

KIRKLAND, PATTERSON & FLEMING, (JAY FRED REEVE, WILLIAM H. SYMMES, and GEORGE T. TOWNLEY, of counsel,) for plaintiff in error.

MOLONEY & POSTELNEK, (PETER POSTELNEK, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On a hearing before an arbitrator on the application of Mike Ledina, defendant in error, (herein called applicant,) for compensation, filed with the Industrial Commission, there was a finding that Ledina was entitled to have and receive from plaintiff in error, the George A. Fuller Company, (herein called respondent,) the sum of $14 per week for a period of fifteen weeks for temporary total incapacity; that the sum of $154 had been paid on the award, which paid it to February 11, 1925; that the remainder of the award, from February 12 to March 12, 1925, amounting to $56, had not been paid, and an order was entered on June 17, 1925, that the remainder of the award be paid by respondent. The commission found that first aid, medical, surgical and hospital services had been furnished by respondent; that applicant's average weekly wage was $36.30; that at the time of the injury he had no children; that compensation had been paid to him up to February 12, 1925; that from that date he became permanently and partially incapacitated from performing his usual and customary line of employment as a result of his injury, and that he is entitled to compensation therefor at the rate of $13.60 per week for a period of 275 weeks, beginning with February 12, 1925, under the provisions of paragraph (d) of section 8 of the Workmen's Compensation act. The commission entered an award in accordance with its finding. The award was reviewed in accordance with the provisions of the statute and confirmed by the superior court of Cook county. This court allowed respondent a writ of error.

The sole question argued in the briefs of the parties is whether or not the applicant was partially and permanently

injured and entitled to an award on the basis of such finding by the commission.

Mike Ledina, applicant, through an interpreter, on June 12, 1925, testified as follows: He is thirty-six years old and single. He has been in this country about a year and a half. He was injured November 26, 1924, while in the employ of respondent. He was carrying an iron beam on his shoulder while working at building construction work. He stepped on a plank, the plank slipped and his foot slipped, and by reason thereof he fell backwards, striking his back on another iron beam. (He indicated that the iron beam came in contact with his back in the lower lumbar region when he fell.) He could not get up after the fall. He was picked up and taken in a machine to Dr. Baylor's office. He was sent to the Passavant Hospital, where he remained thirty days under the care of Dr. Baylor. He was placed in a cast for twenty-two days, which was applied from the upper part of his thigh to the upper part of his breast. He had pains in his back and couldn't lie or sit down. From the hospital he was taken home in a machine on December 23, where he remained in bed most of the time. A part of the time he would go to his doctor for treatment and once in a while the doctor would visit him at his home to treat him. The doctor applied electric heat to his back. Three X-ray pictures were taken of his back while he was in the hospital and two were taken after he left the hospital, all of which were introduced in evidence. On the 18th day of May he began working in a restaurant, washing dishes, cleaning up the restaurant, and doing other such light work. He quit two days before he testified, and stated that he intended to go back to that work after the hearing in his case was concluded. When he stoops down he has pain in his back, like a knife sticking him. He has the same pain all the time. He has tried heavy lifting but cannot do it. He never had an accident before or since his present one. On cross-examination he stated that in February respondent

offered to put him back to light work on the building at $36.30—the same wage he received before he was injured. Respondent did not specify what the light work would be. Witness knew that there was no light work at the building for him to do and for that reason did not accept the offer. He did not understand respondent to specify that his job would be sweeping around the building and pulling nails out of boards, and Mr. Sullivan did not say, for respondent, that he could go back to the building and sweep up the place and pull nails out of boards until he felt that he was able to do heavy work. Sullivan told him that Dr. Baylor reported he was able to go to work and that he should go to work, and witness argued with Sullivan that he was not at that time able to work. Before his injury he had been working at building labor ever since he had been in this country and is familiar with the duties of a building laborer. He was not able to do anything on February 11, 1925, when he got his last compensation money from respondent. He was not able to do any work prior to May 18, 1925. He took the restaurant job as soon as he felt that he could do light work. He was the only one who worked in the restaurant as dish washer and as floor sweeper. It is a small restaurant in a working neighborhood. Up to noon there is nothing to do. The business of the restaurant is done in the afternoon and in the evening up to nine o'clock, when the restaurant is closed. He does work there about two and a half hours each day and pays for his meals there. He does not have to stoop in doing any of his work there.

By agreement each of the parties was to submit reports of physicians who had previously examined applicant and made such reports instead of taking their testimony under oath, and the X-ray pictures taken by the doctors on behalf of respondent and applicant were also to be submitted to the arbitrator as evidence. Under this agreement applicant introduced the reports of three physicians who had previously examined him and made such reports. The first was

a report of Dr. Paul B. Magnuson, which was made on March 6, 1925, and is in substance as follows: The patient complains of pain at the level of the third lumbar vertebra, about one and a half inches to the right of his spine. At that point he is tender and on repeated examinations he returned to that point exactly as a tender spot. He also has pain in the right gluteal and sacro-iliac region. On examination flexion to the right and to the left is painful at the third lumbar—more on the right flexion than on the left flexion. A forward flexion gives pain in the right sacro-iliac and gluteal region. The points were marked with ink and checked up on repeated examination. Extension to the right gives severe pain, applicant says, in the right sacro-iliac and gluteal region; extension to the left not so much pain. Applicant says that extension to the right gives him more pain than any other motion. There is no muscle spasm on either side. The lateral motions are normal. Rotation to the right and to the left gives more pain in the right sacro-iliac joint. He does not find any fracture of the eleventh rib at this time. The X-ray pictures taken by Dr. Potter show a fracture of the right transverse process of the third lumbar vertebra. There is no displacement at this time. The angle of the right ilium as compared with the left, in its perpendicular with the spine, is much more acute, and judging by the profile of the lower part of the sacro-iliac joint there is a noticeable difference between the two sides, the right appearing to have been displaced upward. He believes that this man's trauma caused a fracture of the transverse process of the right third lumbar vertebra. No displacement is shown at this time, with the rotation of the ilium on the sacrum on the right side. Witness advises support over the lumbro-sacral region to overcome the disability.

Dr. Bernard P. Conway, of Chicago, made this report for applicant: Ledina is suffering from tenderness over the third lumbar vertebra; also some pain in right sacro-

iliac region. He suffers from a fracture to the right transverse process of the third lumbar vertebra and a separation of the right sacro-iliac joint. These injuries are severe in nature and have resulted in his inability to do heavy work. He should be wearing a Goldthwaite belt for support to his back. He is unable to work at this time and it is not unlikely that he will be disabled for six months more.

Dr. Frank W. Baylor, of Chicago, on December 17, 1924, made the following report for respondent: He examined Ledina at his office on November 26, 1924, and sent him to the Passavant Hospital. He had no medical treatment before that time. He has a fracture of the extreme tip of the eleventh rib on the right side. There was a marked separation of the fracture. There was also a fracture of the lateral process of the third lumbar vertebra, a chipped fracture of the body of the lumbar vertebra, and a severe contusion and abrasion over the right lumbar region. He has no other physical deformity or constitutional infirmity. On being asked to give the date on which the claimant would be able to resume work, his answer was, "Indefinite." He stated that he was not applicant's regular physician. He made another report for respondent under date of February 25, 1925, which is in substance the following: He made a final examination of applicant and discharged him from further treatment on February 25, 1925. In his judgment he will have no permanency after he has done some form of work from four to six weeks. He has good bone unions of all the· fractures sustained—described as a fracture of the eleventh rib, right side, a fracture of lateral process of the third lumbar vertebra, and a fracture of the body of the fourth lumbar vertebra. He noted a small scar over left side of the back, and a small scar, about two inches in length, over the region of the tenth and eleventh ribs, which scars are causing no permanency from a manual labor standpoint. Applicant complains of pain from bending or twisting his body to a certain extent, which, in the doctor's

opinion, is due to involvement of the small intra-vertebral ligaments on the right side, between the third and fourth lumbar vertebræ. The ligaments that attach to the lateral process of the third lumbar vertebra no doubt were injured, being taut over that region. In the doctor's judgment, after applicant has worked for a while his condition will be normal.

Dr. Nathaniel H. Adams made this report for respondent under date of March 12, 1925: Applicant states that he has always been able to pass his urine naturally. His ears are filled with hardened wax. His teeth need attention. Pulse 76 per minute. Blood pressure 130-70. He complains of pain in his right shoulder. He has no limitation in shoulder motion. The range of spinal motion is normal in all directions. Extreme motion is painful to him. So is pressure over the right transverse process of the third lumbar vertebra and over the sacrum. He did not complain of pain over the sacro-iliac joint except when the doctor pulled the right thigh upwards to the extreme limit while he was lying on his belly. There is a brownish, discolored area one by one-half inch on the right side of his back. It may have resulted from abrasion. His lumbar and gluteal muscles are normal in tone, evenly developed and not spasmodically contracted. He agrees with Drs. Baylor and Magnuson that there was a fracture of the transverse process of the third lumbar vertebra and states that it has healed in alignment, with a firm union. He also states that the slight difference in relation of the posterior angles to the center of the column is, in his opinion, an anomaly, pre-existent and not traumatic. He gave no opinion as to whether or not there was a fracture of the eleventh rib or a chipped fracture of the body of the fourth lumbar vertebra. He further states that applicant is in normal condition in every way except as he has otherwise above stated, and should be given light work to start with and eventually his regular work.

William J. Sullivan testified for respondent that he had charge of this case for respondent from start to finish. On February 26, 1925, Ledina came to his office and witness explained to him what Dr. Baylor had to say, to the effect that witness could put him back to light work at that time. He told Ledina that he could go to work at light work on the job at $36.30 a week—his same old wage—until such time as he was able to resume regular work. He told him the light work was such as "sweeping around" and knocking nails out of boards. He made this offer through Albert Goodman, who was acting as applicant's agent and interpreter. Applicant replied to this offer that he didn't want to go back to work at all.

Albert Goodman testified for applicant that he was acting as agent for him up to the time of this hearing. When Sullivan was talking to him about this case it was concerning a settlement of it. Witness, for applicant, offered to Sullivan to settle the case for $1500. Sullivan offered applicant $500 and a job at light work in settlement. Later, Sullivan withdrew the offer of giving him light work and proposed that applicant accept $500 in settlement or go to work at the regular work that he did before the accident. Sullivan then took the witness stand and testified that Goodman did not ask him $1500 for applicant in settlement, but that his proposition was that respondent pay applicant $500 and give him a light job at his regular wage, and that witness replied to that offer that he would give him $500 in settlement or a light job at his regular wage but would not give him both.

It was agreed by the parties that the Industrial Commission's medical director, Ira B. Robertson, should also make a report of his findings, in writing, to the arbitrator. The medical director did make such a report June 12, 1925, substantially as follows: Applicant gave the history of his injury of November 26, 1924. He is now complaining of pain in the right lumbar region and in the right sacro-iliac

region. Examination reveals a man of good muscular development. There is no definite pain, on palpation, in the lumbar region or sacro-iliac region. At any point upon which witness made pressure and asked regarding the same applicant would state that there was pain. When pressing the same point and not asking about pain he gave no evidence of any pain or tenderness. He is able to bend forward fairly well. He is able to squat in a sitting posture. There is no muscular rigidity in the lumbar region. The X-ray pictures reveal an incomplete fracture of the transverse process of the third lumbar vertebra on the right side and a fracture at the tip of the eleventh rib on the right side. The twelfth rib on the right side is considerably shorter than the corresponding one on the left side. That is an abnormality and has no connection with the injury. The X-ray pictures show complete union of the fracture at the tip of the left rib and union of the transverse process of the third lumbar vertebra, with no excess callus. He believes applicant should now be working. The fact that he has not worked since November, 1924, (the fact is that he did do light work in the restaurant,) would probably make it impossible for him to begin immediately doing heavy work. He believes that if applicant begins doing light work, in two months he will be able to perform any work that he could do at the time of his injury. He does not think there should be any disability beyond that time. The foregoing is all the evidence before the arbitrator.

On the petition for review of the decision of the arbitrator, filed by applicant June 30, 1925, the hearing on review before the commission was had on August 31, 1925. On that hearing all of the evidence taken before the arbitrator was considered, together with further evidence submitted by both parties. Applicant testified on that hearing that he continued working in the restaurant about twenty days after the first hearing. After that, on June 15, 1925, he tried to work in a building at Thirty-third and Henrietta

streets, mixing concrete and carrying it up to the building. He worked from eight o'clock until 11:30 of that day and was told to quit. During the hours that he worked he had sharp pains in his back when he stooped down and was not able to do the work. He did not work again after that. He cannot do heavy work and can't get any light work to do. He can do anything that would not require bending down and lifting heavy objects. He tried several times to lift a box of coal weighing about twenty-five or thirty pounds but couldn't do it. When he tried to lift the box of coal he received pains in his back, "just like two sharp knives sticking me." He feels about the same as he did at the last hearing. There has been no change in him. Since the last hearing he has been examined by Dr. Leroy Kuhn, and was examined by Dr. Magnuson on August 31,—the day he testified before the commission. He further stated that he is right-handed, and has had no injury since his injury on November 26, 1924. If he had a job like the one he had in the restaurant he could do that kind of work, as it requires no bending or stooping. He was earning $9 a week in the restaurant.

Dr. Magnuson testified for applicant that he again examined him on August 31, 1925, and found practically the same condition which he found on March 6, which latter findings he reported to the arbitrator. He does not think that applicant is now able to perform the work of a building laborer or that he was able to do so on March 6. The X-ray pictures show, and it is his opinion, that there has been a union of the transverse process of the third lumbar vertebra, and that there is no excess callus surrounding it. There is nothing to prevent applicant from walking around. He very much doubts that he could do any stooping with the dislocation of the sacro-iliac as it is now. He can do light work, such as may be done in a standing position, but he does not think he could do any work that requires stooping or lifting. He has a tipping of the ilium on the sacrum

now. His posterior-superior spine is half an inch higher now on the right than on the left side. It shows a tilting in the X-ray pictures. At this point in his examination applicant was stripped, and, in the presence of the other physicians who testified on this hearing, Dr. Magnuson pointed to the injuries of applicant's spine. He called attention to the left posterior-superior spine and stated that it was a little hard. He also called attention to some dimples in applicant's back, and then stated: "If you put your fingers there you will find that the bony point of the right is that much higher than the left. In other words, the ilium is rotated there. That is what makes the change in the angle between the ilium and the perpendicular of the spine on that side and the ilium and the perpendicular on that side,"—pointing first to the right side and then to the left side. He further stated that the condition of the spine he described will last for a long time, because there is a strain on those ligaments and muscles in the region where the displacement has occurred. Any excess strain sets up an inflammation in there and "constantly aggravates the same." He thinks the condition will remain that way permanently.

Dr. Leroy P. Kuhn testified for applicant that he examined him on July 30, 1925. He put him through the usual exercises of a back injury—posterior and lateral movements and rotary movements. He took his temperature, pulse, respiration and blood pressure, all of which latter tests were normal. The movements of the back caused him to complain of a great deal of pain, which he localized, "as he has done this morning," over the right sacro-iliac superior portion and in the vicinity of the third lumbar vertebra—a little lower than the third vertebra on the right side. No matter how much he tried to distract applicant's attention, he would come right back to that location. He later examined the X-ray plates, which showed very clearly a fracture of the transverse portion of the third lumbar. Applicant was

not able to stoop without pain. He complained of pain on pressure over and near the third lumbar vertebra. There was no abnormality to be found on objective examination except the tilting of the pelvis, which indicates some marked twisting or spraining of that portion of the body. He considers that it was due to trauma. It is his opinion that the conditions which he found on applicant's spine, and which the other physicians found on various examinations, were caused by his injury, and that he is not now able to do the work of a building laborer. He further stated that applicant's sacro-iliac joint is not "dislocated" in the term that a surgeon would understand, but that it has been pushed up higher on the right side than on the left. Applicant has fairly good teeth. Witness did not find any decayed teeth in his mouth.

Dr. Baylor testified for respondent to practically the same facts shown in his two reports before the arbitrator. He further stated that there was no fracture of the sacro-iliac joint on either side of applicant's spine. The last time that he examined him was on February 26, 1925, which was previous to the report he made to the arbitrator. At that time applicant was ready for some form of light work, as witness then told him, and after three or four weeks of such light work he would have been able to do any form of labor. He has observed nothing since that has changed his mind. His attention was called to what Dr. Magnuson pointed out when applicant was stripped to the waist. He observed at that time the entire spine and the two dimples referred to by Dr. Magnuson, and states that where the two bones come together in that portion of the spine they form the sacro-iliac joint and usually cause a depression. This depression is usually larger on the side of the spine which is the more developed, and he accounts for this depression and tilting of the right side to the fact that applicant is right-handed. He further states that there is no abnormality in the condition of applicant's spine that he observed. He

made no report for the arbitrator of the condition of that portion of the spine because he did not consider it abnormal. Nothing occurred when applicant was stripped to change his former opinion. He does not see why applicant has not been working. He appears to be well nourished for his height and size. From the observation which he made when Dr. Magnuson was calling attention to applicant's spine he thinks that applicant is able to work at light work for three or four weeks and then he will be able to do heavy work. On being asked, on cross-examination, to what he attributed the present complaint of applicant of pains in the spine, his answer was that from the X-ray pictures and from his physical examination he could not see any point that was causing such pain. He further stated that from his physical examination he does not believe that applicant had any such pains.

Dr. Adams also testified for respondent to conditions of applicant's spine substantially as he reported to the arbitrator. He further testified that whether or not there is a difference in the sacro-iliac joint now from what it was before the injury, or whether it is merely an anomaly and not the result of injury, he is absolutely unable to tell. He does state that when he saw this man he was suffering from the effects of a broken transverse process of the third lumbar vertebra and from the effects of a sprain of the right sacro-iliac, but there was no dislocation there that he could make out. At the time he made his report he had hoped that applicant could work back into his regular work, and that nothing occurred in the examinations "this morning" to change his opinion. His condition seemed to be about the same. On cross-examination he stated that applicant's condition, as far as the fractured vertebra is concerned, is absolutely permanent. He further stated that it was his hope that applicant would get better, and that he would not like to say that he would be absolutely incapacitated for work all his life. He could not say absolutely that appli-

cant, by going back to some light work, will in time be able to do the work of a building laborer. It is hopeful that he may be able to do so. "I believe there is a tilting of the pelvis. These doctors describe the condition correctly. It is only a question whether there was a little tilting, which had no reference to the accident, or whether it came from the accident. The tilting of the pelvis may have been due to the accident and it may not have been. All these doctors have told the story and described it correctly. I am absolutely unable to state whether that little difference is the result of the injury or whether it was there" before the injury.

All of the doctors who made reports or gave testimony were either proven or admitted to be competent to give expert testimony in this case. We have set out substantially the testimony of all the witnesses, as the question in this case is merely one of fact. We do not deem it necessary to make any extended discussion of the evidence, as the evidence for applicant, when considered with that of respondent, clearly establishes the fact that he was partially and permanently injured, and by reason of his injury is, and will continue to be, unable to do any character of work that requires stooping or lifting heavy objects. He can now only perform light work, and such light work as may be done in a standing or sitting position. His own testimony, and the testimony of the expert physicians who testified in his behalf, clearly establishes that fact. The evidence of the two physicians who testified for respondent, to the effect that applicant would be able to do any character of heavy work by first performing light work for four or six weeks, cannot be accepted as true on the theory that applicant refused to do light work. The evidence shows that he did do light work from the 18th day of May, 1925, to the 15th day of June, 1925, and that after the hearing before the commission he worked twenty days more in the

restaurant. This is a showing that he worked seven weeks, lacking one day, at light work in the restaurant, and was at the end of that time not competent to do hard work or any character of work that required stooping or lifting heavy objects, which is virtually admitted by all the physicians who testified. His evidence shows that he worked as long as he could get work and began to do light work as soon as he was able to do such work, and has been idle since that time only because he could not get such light work as he could do. The evidence of Sullivan, for respondent, to the effect that in February, 1925, he offered to give applicant a light job of work at sweeping and pulling nails out of boards at the building respondent was completing, at the same wage he was receiving before his injury, is no bar to applicant's right to the award made by the commission. Sullivan's testimony is contradicted by the testimony of Albert Goodman and of applicant. Applicant also testified that he went to work in the restaurant on May 18, 1925, the earliest date he was able to work, and that after he quit the restaurant he was unable to get light work which he could do. According to the testimony of Goodman, Sullivan's final offer to applicant was his regular job at his former wage or $500 in settlement of his claim, while Sullivan claims that his offer was $500 in settlement of the claim or a light job at his regular wage. Under this evidence the commission was warranted in its finding that there was no offer at any time by respondent to furnish applicant a job at light work at his regular wage or a light job of work at any wage.

The judgment of the superior court is affirmed.

*Judgment affirmed.*